Filed 3/16/26  P. v. Pavia CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　Plaintiff and Respondent,<br><br>v.<br><br>DANIEL A. RODRIGUEZ PAVIA,<br><br>　Defendant and Appellant. | 2d Crim. No. B338024<br>(Super. Ct. No. LA093470)<br>(Los Angeles County) |

Daniel A. Rodriguez Pavia appeals from the judgment after a jury convicted him of rape.  (Pen. Code,[1] § 261, subd. (a)(2).)  He was sentenced to three years in state prison.  He contends his conviction should be reversed because he was prejudiced by a four-year pre-charging delay.  We affirm.

---

[1] All statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL HISTORY

*Prosecution evidence*

In February 2016, Carlos Campos organized a birthday party for his girlfriend, J.J. He hired a party bus and invited friends, including Pavia, who was Campos's friend. The party bus picked up Pavia at a 7-Eleven where he parked his car. This was the first time J.J. met Pavia. After a night of partying at a club, the group returned to J.J.'s house.

J.J. wanted to continue partying. Campos, J.J., and Pavia walked down the street to Campos's house and got into his car. J.J. was the driver. She hit a curb and blew out a tire. J.J. and Campos argued, and Campos walked back to his home.

J.J. testified that she called an Uber or taxi.[2] When the car arrived, Pavia got into the car with J.J. The car drove for a "few seconds" before Pavia asked the driver to "stop here." Pavia grabbed J.J.'s wrist, and they got out of the car. He held onto her wrist and led her down a street. J.J. was intoxicated. She fell and hurt her knee. Pavia got on top of her and began lifting her dress. He tried to move her underwear around and ripped it. J.J. told him to stop and tried to cover her underwear. Pavia inserted his penis inside J.J.'s vagina and ejaculated onto her leg. When he got off of J.J., she got up and ran away. On her way home, J.J. called Campos and left a voicemail. Campos fell asleep after walking back home and woke up to find missed calls and a voicemail from J.J. In J.J.'s voicemail, she was crying; she said she had been raped. Campos went to J.J.'s home, and she told him Pavia raped her.

---

[2] It is unclear if J.J. hired a taxi or an Uber driver, but for ease of discussion and because both appellant and respondent's brief refer to the driver as an Uber driver, we will do the same.

Campos messaged Pavia, accusing him of raping J.J. Pavia denied what happened and replied, "Don't try to blame me cuz she got picked up by someone else dawg. I [don't know] who picked her up after."

J.J. filed a police report. An officer took J.J.'s statement and took as evidence the clothing and underwear she was wearing the night of the incident. J.J. had a sexual assault examination. She had abrasions and bruises on her knees. DNA swabs were taken from the oral, vaginal, and cervical areas. A laboratory analysis of the external genital and vaginal swabs revealed sperm cells and developed a male DNA profile.

About four years later, in 2020, law enforcement obtained a sample of Pavia's DNA, which matched the male DNA profile from the external genital and vaginal swabs.

*Defense Evidence*

Pavia testified in his own defense. He said that after J.J. drove Campos's car into a curb, she complained her leg hurt. Campos left after arguing with J.J. and she walked off in the opposite direction. Pavia followed her and sat with her as she cried and talked about her fight with Campos. She called an Uber and offered Pavia a ride. When the Uber arrived, they both got into the car. The car stopped at 7-Eleven, where his car was parked. He was resting in his car to sober up when J.J. knocked on his passenger door. She continued to cry about Campos and then started to kiss and touch him. Pavia said J.J. gave him oral sex. They moved to the back seat where J.J. gave Pavia a "lap dance." He testified that his penis entered her vagina and he emitted "pre-cum." Pavia claimed that J.J. never told him to stop. At some point, J.J. and Pavia began to have second

3

thoughts. She "panicked" about cheating on Campos, got out of the car, and left.

Pavia admitted to being dishonest with Campos when he messaged him, and with the detectives in 2016 and 2019 when they interviewed him.

*Investigation*

In April 2016, Detective Martin Pinner interviewed Pavia. Pavia said "he did not think he had sex with" J.J. After the initial interview, Pinner attempted to locate Pavia at his work address for a DNA swab, but the owner advised that it was Pavia's day off. Pinner returned on a date Pavia was scheduled to work, but he was advised that Pavia called in the morning to say he would not be returning to work there. One of the other employees suggested that Pavia was "on the run."

By December 2016, Detective Pinner was transferred and no longer assigned to the case. Another detective contacted Pavia's number and left a message but never received a call back. In February 2017, another detective unsuccessfully attempted to locate Pavia. In November 2018, police officers received a "CAL-DNA Bank Hit" notification reporting that Pavia was a match with the DNA profile developed in J.J's rape case. Pavia was arrested in another incident by the San Fernando Police Department. Around January 2019, a detective retrieved an address for Pavia from the San Fernando Police Department.

In October 2019, a detective attempted to locate Pavia and discovered his place of employment. The detectives found Pavia at work and interviewed him. During this interview, Pavia said that J.J. started hugging and kissing him and that she was on top of him "grinding him."

4

In July 2020, police officers obtained a warrant for Pavia's DNA.  The next month, the laboratory report showed that Pavia's DNA profile matched the profile developed from the vaginal and external genital swabs in 2016.

*Motion to Dismiss*

After the jury found him guilty of forcible rape, Pavia moved to dismiss the verdict on the ground that the four-year pre-charging delay violated his state and federal due process rights.  He argued that he was prejudiced by the loss of the Uber driver's testimony.  The prosecution argued that Pavia was not prejudiced and the justification for the delay was for investigation.

Following a hearing, the trial court denied the motion to dismiss.  The court found the four-year delay to not be "an undue length of time."  The court reasoned that "investigations on this type of case do take time, and at least some of the cause for the delay was the defendant's lying about not having sex with the victim . . . ."  The court found that Pavia did not establish that the delay was prejudicial.  The court observed that the "only thing in dispute is then the fact that somewhere on that street the defendant started to pursue the victim sexually, and she said no, and he continued and forcibly raped her, and he says, no.  It was consensual . . . ."  Because the disputed events occurred outside the car, the court reasoned that the "Uber driver would have no bearing on [whether J.J.'s version of events or Pavia's version of events] is correct in terms of what happened when they were on the street and the sexual advances began, and that's the only point in time where things become in dispute."  Lastly, the court found that "there is substantial justification for any delay.

DISCUSSION

Pavia contends that the trial court erred when it failed to dismiss the case because the pre-charging delay violated his state and federal constitutional rights to a fair trial and due process. He asserts that the delay was prejudicial because it denied him the opportunity to procure the Uber driver's testimony. We disagree.

" '[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' [Citation.] Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' [Citation.]" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).)

" ' "In the balancing process, the defendant has the *initial* burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations]. The showing of prejudice requires some evidence and cannot be presumed. [Citations.]" ' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 874 (*Alexander*).) If a defendant fails to show prejudice, the court need not inquire into the justification for the delay as, under such circumstances, there is nothing to " 'weigh.' " (*Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1541.)

6

If a defendant shows prejudice, the court must balance the prejudice against the justification for the delay. (*Nelson*, *supra*, 43 Cal.4th at p. 1251.) "Even a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal. Therein lies the delicate task of balancing competing interests." (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 915.) "[W]hether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson*, *supra*, 43 Cal.4th at p. 1256.) "The justification for the delay is strong when there is 'investigative delay, [and] nothing else.' " (*People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*).)

We review the trial court's ruling on a motion to dismiss for a pre-charging delay for an abuse of discretion. We review any factual findings for substantial evidence. (*Cowan*, *supra*, 50 Cal.4th at p. 431.) Whether a delay is prejudicial is a factual question that we review for substantial evidence. (*Alexander*, *supra*, 49 Cal.4th at p. 874.)

Here, the trial court did not abuse its discretion in denying the motion to dismiss because substantial evidence supports that Pavia did not establish prejudice. Pavia contends the delay resulted in the loss of the Uber driver as a witness, who could have corroborated that he did not pull J.J. out of the car and that J.J. followed him to his car. He also asserts that the Uber

7

driver's testimony was material to his and J.J.'s credibility. But, the evidence reflects that the driver was not a witness to the actual crime. The driver, at best, could testify as to where the ride ended and the conduct inside the car. However, there was no dispute that J.J. and Pavia had exited the car next to or near the 7-Eleven, there was no evidence of a struggle inside or when they exited the car, and the sexual conduct in dispute occurred entirely outside of the car. The driver could not testify as to whether the sexual conduct was consensual, and "was not a material witness in terms of the disputed facts in question."

Moreover, Pavia does not suggest that the Uber driver would have testified favorably for the defense. (See *People v. Catlin* (2001) 26 Cal.4th 81, 109 [claim of prejudice is "weak" where there was no evidence suggesting that witnesses would have testified favorably for the defense].) Pavia merely asserts that the Uber driver's testimony "impacted the credibility of both [J.J.] and [Pavia], by either supporting or undermining the conflicting testimony of each witness." Under these circumstances, Pavia's claim of prejudice is speculative. "The showing of actual prejudice must be made on competent evidence and 'must be supported by particular facts and not . . . by bare conclusionary statements.' [Citation.] Speculative arguments are inadequate to establish actual prejudice." (*People v. Manzo* (2023) 96 Cal.App.5th 538, 541.)

Here, there was no prejudice. The delay was justified and there was no evidence to suggest that there was a purposeful delay for the prosecution to gain an advantage. Rather, the police investigation reports, which provide a detailed history of the investigation, reflect the delay was in part due to the difficulty in locating Pavia and serving him a warrant for his

8

DNA. The justification for an investigative delay required a "greater showing of prejudice . . . [is] required to establish a due process violation." (*Nelson*, *supra*, 43 Cal.4th at p. 1256; see also, *Cowan*, *supra*, 50 Cal.4th at p. 431.)

To the extent Pavia argues the delay was due to "police inaction or negligence," we disagree. "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson*, *supra*, 43 Cal.4th at pp. 1256-1257.)

As prejudice, if any, was minimal and outweighed by the justification for delay, there was no abuse of discretion in denying the motion to dismiss.

DISPOSITION

The judgment (order) is affirmed.

NOT TO BE PUBLISHED.

DEROIAN, J.*

We concur:

YEGAN, Acting P. J.               CODY, J.

---

* Judge of the Santa Barbara Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9

Alan K. Schneider, Judge

Superior Court County of Los Angeles

_____

Lori A. Nakaoka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Seth P. McCutheon and Charles Chung, Deputy Attorneys General, for Plaintiff and Respondent.